## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EXELON GENERATION COMPANY,                )
LLC, 300 Exelon Way, Kennett Square, PA   )
19348,                                    )
                                          )
      *Plaintiff,*                         )
                                          )
    v.                                    )     Civil Action No. _____
                                          )
BENJAMIN H. GRUMBLES, Secretary of        )
the Environment, State of Maryland, Mont- )
gomery Park Business Center, 1800 Washing-)
ton Boulevard, Baltimore, MD 21230, *in his* )
*official capacity*,                        )
                                          )
*and*                                       )
                                          )
D. LEE CURREY, Director, Water and Sci-   )
ence Administration, Maryland Department  )
of the Environment, State of Maryland, Mont- )
gomery Park Business Center, 1800 Washing-)
ton Boulevard, Baltimore, MD 21230, *in his* )
*official capacity*,                        )
                                          )
      *Defendants.*                       )

_____

## COMPLAINT
_____

Plaintiff Exelon Generation Company, LLC ("Exelon" or "Plaintiff") hereby files this

Complaint for declaratory and injunctive relief against Defendants Benjamin H. Grumbles and

D. Lee Currey.

## **INTRODUCTION**

1.     The Chesapeake Bay is the largest estuary in the United States and a critical natural

resource for the people of Maryland.  Exelon, through its subsidiaries, delivers electricity to the

overwhelming majority of Maryland homes and businesses, and Exelon strives to support the environmental goals of all its customers and the States in which the Company operates. Exelon also is the owner and operator of the Conowingo Hydroelectric Project ("Conowingo Project"), a dam and hydroelectric facility on the lower Susquehanna River that generates more renewable electricity than all other facilities in the State of Maryland combined. Exelon has been, and remains, committed to operating the Project in a manner that is environmentally responsible in all respects.

2.      The Project is required to renew its operating license from the Federal Energy Regulatory Commission ("FERC"). As part of that process, Exelon is required by the federal Clean Water Act ("CWA") to obtain a certification from Maryland that the Project's discharge will comply with applicable provisions of the CWA and state law.

3.      This Complaint arises from several steps the Maryland Department of the Environment ("MDE") has taken with respect to the CWA Certification (the "Certification") for the Conowingo Project, including (1) MDE's April 27, 2018 issuance of the Certification to Exelon; (2) MDE's May 8, 2018 submission of the Certification to FERC; and (3) MDE's May 11, 2018 publication of the Certification in the *Maryland Register*.

4.      For the first time in the nearly century-long operation of the Conowingo Project, the Certification makes the Project's owner responsible for cleaning up pollution that it did not create and has no reasonable way to remove. The Certification purports to impose a requirement that the Project "shall annually reduce" by millions of pounds the amount of nitrogen and phosphorus discharged into the Susquehanna River by upstream sources (the "Required Nutrient Reductions"). MDE is demanding that the Conowingo Project remove from the Susquehanna River nutrients that were not added to the river by the Conowingo Project, but already are present

in the Susquehanna River before the river water reaches the Project.  Indeed, since its construction in the 1920s, the Project's dam has protected the Chesapeake Bay (the "Bay") by trapping pollutants that flowed downstream from New York and Pennsylvania, preventing them from reaching the Bay.  The source for much of the nitrogen and phosphorus in the Susquehanna River is runoff from agricultural operations in Pennsylvania and New York, hundreds of miles upstream from the Conowingo Project.

5.      MDE has not identified effective or reasonable means for achieving the Required Nutrient Reductions at the Conowingo Project.  Rather than suggest a plausible path forward, MDE seeks payment from Exelon in lieu of the Required Nutrient Reductions in excess of $172 million annually — more than $7 billion over the term of the Project's FERC license — while continuing to fail to address pollution at its source.  This fee for pollution that Exelon did not create amounts to nearly a half-million dollars per day, each day, for more than 40 years.  This amount exceeds, by orders of magnitude, the economic value of the Conowingo Project as an operating asset.

6.      Additionally, the Certification requires the Project to remove "all" visible trash and debris from the Susquehanna River, regardless of where that trash entered the river along its 464-mile course, or who deposited it.  The Certification also requires the Project to take onerous measures to stop invasive species of fish from moving upstream, even though the dam does not contribute to the upstream migration of invasive fish species, but instead helps block such migration.

7.      In sum, simply because Exelon's federal license was subject to renewal, the Certification imposes on Exelon the costs of cleaning up a watershed that Exelon did not pollute. This unprecedented decision to impose on Exelon the obligation to remove from the Susquehanna River pollution discharged into the river by others exceeds MDE's authority under federal law.

8.      MDE has unilaterally placed this obligation on Exelon rather than working collaboratively through the U.S. Environmental Protection Agency's ("EPA") Chesapeake Bay Program, which requires that sources of pollution be held accountable and that responsibility for improving the Bay's water quality be equitably allocated across the Bay's entire watershed.  MDE faced the risk that EPA would allocate much of the responsibility for reducing pollution in the watershed to the State of Maryland, which in turn would have been required to regulate in-state polluters more stringently.

9.      Exelon shares Marylanders' concerns that pollution is jeopardizing the health of the Chesapeake Bay, and Exelon will continue to partner with state and local governments to protect this essential ecosystem.  But it is unreasonable for the State of Maryland to expect Exelon to shoulder the entire burden of removing excess nutrients and all trash at the end of a 464-mile river.

10.     Exelon asks this Court to declare that the Certification's requirements exceed Maryland's authority under the Clean Water Act and violate the United States Constitution, and to order Defendants to withdraw the Certification and then promptly notify FERC of the withdrawal.

## JURISDICTION AND VENUE

11.     This is an action for declaratory and injunctive relief for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1387, and the United States Constitution.

12.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331. This action and the remedies it seeks are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and by Federal Rule of Civil Procedure 57.

13.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a state water-quality certification was formally requested on April 29, 2013, by FERC, located in the District of Columbia; the Certification was formally submitted on May 8, 2018, to FERC's Secretary, whose

office is located in the District of Columbia; and the Certification contains requirements that, absent judicial intervention, will become conditions on a federal license that FERC will issue in the District of Columbia.

## PARTIES

### A.   Plaintiff

14.   Plaintiff Exelon Generation Company, LLC ("Exelon") is a Pennsylvania limited liability company that generates and markets electricity in Maryland, the District of Columbia, and elsewhere.

15.   Exelon is a fully owned subsidiary of Exelon Corporation, a Pennsylvania corporation with its headquarters in Chicago, Illinois.

### B.   Defendants

16.   Defendant Benjamin H. Grumbles is Maryland's Secretary of the Environment and thus the head of MDE.  Defendant Grumbles has responsibility for carrying out and enforcing the provisions of Maryland's Environment Code and the rules and regulations adopted under it, including Code of Maryland Regulations § 26.08.02.10, which governs the process for issuing certifications under CWA Section 401, 33 U.S.C. § 1341.  Defendant Grumbles transmitted the Certification to FERC for incorporation in the Conowingo Project's federal license.  Defendant Grumbles is being sued in his official capacity.

17.   Defendant D. Lee Currey is the Director of MDE's Water and Science Administration.   Defendant Currey exercises enforcement authority delegated to him by Maryland's Secretary of the Environment.  He signed and issued the Certification.  Defendant Currey is being sued in his official capacity.

## FACTUAL BACKGROUND

**A.      The Conowingo Hydroelectric Project**

18.      Plaintiff Exelon owns and operates the Conowingo Project, a 573-megawatt hydroelectric power plant located on the lower Susquehanna River in Maryland.

19.      The Susquehanna River flows for nearly 450 miles through New York and Pennsylvania and then through Maryland for about 15 miles before emptying into the Chesapeake Bay, North America's largest estuary.  The Conowingo Project is located about ten miles upstream of where the Susquehanna River flows into the Chesapeake Bay.

20.      The watershed for the Susquehanna River drains a land area of more than 27,000 square miles and includes over 40,000 miles of waterways in New York, Pennsylvania, and Maryland upstream of the Conowingo Project.

21.      Since its construction in 1928, the Conowingo Project has provided multiple benefits to the Chesapeake Bay, surrounding communities, and the State of Maryland.

22.      Though never required by law to perform a pollution-reduction function, the Conowingo Project historically has protected the water quality of the lower Susquehanna River and the Chesapeake Bay by trapping some of the nutrient pollution introduced into the River by upstream sources in Pennsylvania and New York, reducing its potential to reach the Bay.  Without the Conowingo Project, these pollutants would have entered the Bay years ago.

23.      EPA's Chesapeake Bay Program has recognized that "[t]rapping of pollutants by the Conowingo reservoir over the past 80+ years has benefited the water quality of the Bay" and has "benefited states by lessening [pollutant] load reduction responsibilities."

24.      The pollutants at issue are generated upstream of the Project.  The Project does not generate any nutrients (such as nitrogen or phosphorus).

25.     As with any dam, however, the Project's trapping capacity has been declining for many decades, as sediment flowing downstream was deposited in the Conowingo Reservoir, reducing its depth.

26.     The Conowingo Project also provides benefits to wildlife.  It provides breeding, nesting, and foraging grounds for the American Bald Eagle and helps migratory and native fish travel over the dam for spawning in the Susquehanna River, using multimillion-dollar fish lifts.

27.     For nearby residents as well as visitors, the Conowingo Project provides opportunities for educational programs and for recreation, including boating, hiking, fishing, and birdwatching.   It provides 15 recreational facilities and public-access areas, including boat launches, marinas, and scenic overlooks.

28.     The Conowingo Project generates approximately $273 million in annual economic benefits to Maryland and its local communities by supporting full-time jobs, driving tourism in northeastern Maryland, and contributing to local and state tax revenues.

29.     The Conowingo Project is Maryland's largest source of renewable energy, producing more than 55% of Maryland's renewable energy.  Compared to a coal facility of similar size, the Conowingo Project avoids the release of 6.5 million tons of greenhouse-gas emissions annually.

**B.     FERC Relicensing of the Conowingo Project**

30.     Exelon is seeking renewal by FERC of its operating license for the Conowingo Project for a term of 50 years.

31.     Exelon is pursuing the relicensing using FERC's integrated licensing process, which involves consultation with regulatory agencies and stakeholders on various issues, including fish passage, water quality, shoreline management, and recreational conditions.

32. In support of the integrated licensing process, Exelon developed a study plan during the pre-application stage, in or about 2009.

33. Under that plan, Exelon performed more than 45 separate studies regarding various environmental issues, including fish passage, stream flow, the movement (transport) of sediment, and water temperature. Exelon also supported or cooperated with additional studies or evaluations by the United States Army Corps of Engineers (the "Army Corps") and EPA that extended beyond the Conowingo Project and more broadly concerned the Chesapeake Bay.

34. Exelon completed these studies in 2012.

35. On August 31, 2012, Exelon filed an application with FERC to renew its operating license for the Conowingo Project.

36. In 2015, FERC issued an Environmental Impact Statement ("EIS") for three hydroelectric projects on the lower Susquehanna River, including the Conowingo Project. FERC's EIS concluded that for dissolved oxygen, existing project operation generally does not exceed state water-quality standards. The EIS noted that the Susquehanna River is the largest source of freshwater to the Chesapeake Bay, contributing about 70% of the total nitrogen and 55% of the total phosphorus, and that the presence of these pollutants is a watershed-wide issue. The EIS stated that, if the reservoirs' capacity to store sediment and other pollutants was reduced, then "governmental jurisdictions in the watershed might need to increase their … nutrient-reduction efforts."

37. The EIS also considered whether dredging might be a reasonable way to increase the Conowingo Reservoir's trapping capacity. Citing the Lower Susquehanna River Watershed Assessment ("LSRWA"), a joint effort of the Army Corps and MDE, FERC's EIS reported "that

operational changes at Conowingo would not address the sediment transport issue, and that dredging of Conowingo [Reservoir] would be cost prohibitive and ineffective."

38.     As part of the relicensing process, Exelon engaged in detailed negotiations with the United States Department of the Interior and entered into a settlement.  Exelon committed to enhancing fish passage by trapping and transporting fish to reduce the time it takes them to reach spawning locations.  As part of the settlement, Exelon will haul the fish not just to the Conowingo Reservoir, but further upstream past three additional dams to ensure that a high percentage of fish successfully complete their journey.

### C.     Section 401 of the Clean Water Act

39.     As part of the relicensing process for federal hydroelectric facilities, applicants are required to seek a state certification under CWA Section 401.  That statute provides States the opportunity to review requests by applicants for federal licenses and to certify whether the discharge associated with the activity being licensed will comply with specific CWA provisions. 33 U.S.C. § 1341(a)(1).

40.     A State may grant a certification under this Section ("a 401 certification"), either with or without conditions, deny a certification, or waive its power to grant or deny.  33 U.S.C. § 1341(a)(1).

41.     In providing a conditional 401 certification, a State may "set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure" that the applicant "will comply" with various limitations under designated CWA provisions, where applicable, "and with any other appropriate requirements of State law."  33 U.S.C. § 1341(d).

42.     Limitations or requirements set forth in a conditional 401 certification "shall become a condition on [the applicant's] Federal license."  33 U.S.C. § 1341(d).  FERC believes

that it lacks the authority to review the legality of State-imposed conditions and is required to incorporate them in the federal hydroelectric license, even if they are inconsistent with federal law.

### D.      Exelon's Application to MDE for 401 Certification

43.      On January 31, 2014, Exelon submitted a request to MDE for a 401 certification in connection with the FERC relicensing of the Conowingo Project.

44.      That application included copies of studies that had been completed as part of the FERC relicensing process.

45.      In response to the application, MDE asked Exelon to conduct an additional study to understand the impacts of sediment transport on water quality in the Susquehanna River and the Chesapeake Bay (the "Sediment Study").

46.      While Exelon believed its application was complete and that no additional study was required for MDE to issue a 401 certification for the Conowingo Project, in December 2014 Exelon entered into an agreement with MDE to work with Maryland agencies, the Army Corps, the U.S. Geological Survey, the University of Maryland Center for Environmental Science, and EPA to design and conduct a multi-year Sediment Study, to provide additional information to MDE.

47.      Exelon paid $3.5 million to fund the Sediment Study.

48.      States must act on applications for 401 certifications within one year, but the Sediment Study would not be completed within that time.  On December 4, 2014, cognizant of MDE's desire for additional study, Exelon provided MDE with more time by withdrawing its application for a 401 certification and then timely refiling.

49.      Exelon refiled its application for a 401 certification on March 3, 2015, and withdrew that application on February 5, 2016, pending conclusion of the Sediment Study.

50.     Exelon again refiled its application on April 25, 2016, and withdrew that application on February 17, 2017.

51.     Each time Exelon withdrew and refiled its application, it did so to cooperate with MDE's stated desire for more time to study the 401 certification request.

52.     On March 13, 2017, MDE indicated that it expected to receive Exelon's resubmission no later than May 18, 2017, and would, upon receiving the resubmission, initiate its review of the water-quality impacts associated with the Conowingo Project.

53.     On May 17, 2017, Exelon submitted another request to MDE for a 401 certification in connection with the relicensing of the Conowingo Project.

54.     The studies that Exelon submitted to MDE as part of its request and the information in the record before MDE demonstrate that the Conowingo Project is not the source of pollution entering the Susquehanna River.  They also demonstrate that the Project is meeting all applicable state water-quality standards in waters immediately downstream.

55.     The Sediment Study confirmed that Conowingo Project operations introduce negligible amounts of sediment into the water, solely from natural causes, and do not cause downstream water-quality violations that may result from sediment transport.

56.     Similarly, the Water Quality Study shows that the average dissolved-oxygen ("DO") conditions within all of the turbine boils are always at or above standards, that DO standards in the tailrace (where water from the turbines is discharged) are met, that DO standards are being met immediately downstream of the Project, that minimum and maximum turbidity values recorded downstream are within state water-quality standards, and that operation of the Conowingo Project has no measurable effect on the temperature of the water being released downstream.

57.     Likewise, the aquatic-resources studies show that the Conowingo Project is not adversely impacting fish propagation and instead supports a diverse assemblage of fish and a healthy multi-species sport fishery supported by natural reproduction.

**E.     MDE's Issuance of the 401 Certification**

58.     On April 27, 2018, MDE issued the Certification to Exelon pursuant to CWA Section 401; Title 9, Subtitle 3 of the Maryland Code, Environment Article; and Section 26.08.02 of the Code of Maryland Regulations.

59.     The Certification states that it is a final decision.

60.     Defendants published the Certification in the *Maryland Register* on May 11, 2018.

61.     In a departure from the State's previous 401 certifications and previous recognition by the State and others of the Conowingo Project's benefits to the Bay, the Certification asserts that "the Project adversely impacts water quality in the State of Maryland."

62.     The Certification imposes conditions that require Exelon to address impacts on the Susquehanna River that are caused by upstream polluters and are unrelated to the activities of the Conowingo Project.

63.     The Certification contains conditions regarding dissolved oxygen that, among other things, require Exelon to undertake Required Nutrient Reductions that would annually reduce the amount of nitrogen and phosphorus in the Project's discharges by 6,000,000 pounds and 260,000 pounds, respectively.  (High levels of nutrients such as nitrogen and phosphorus can cause low levels of dissolved oxygen.)

64.     The Certification provides no authority for requiring Exelon to remove nutrients from the Susquehanna River rather than imposing future nutrient reductions on the sources of those nutrients.

12

65. Nor does the Certification identify any effective or reasonable means to achieve this massive nutrient removal at the Conowingo Project, which is downstream from the sources of these pollutants.

66. Instead, MDE seeks payment from Exelon in excess of $172 million annually, the installation of best management practices and/or ecosystem restoration activities, and/or dredging of the Conowingo Reservoir.  None of these purported nutrient-reduction methods actually addresses the sources of the pollution.

67. Section 7.D.iv of the Certification provides that Exelon "shall provide to MDE for review and approval, no later than December 31, 2019, a nutrient corrective action plan (the 'NCAP') for achieving the Required Nutrient Reductions and otherwise ensuring that DO [dissolved oxygen] levels in the DO Non-Attainment Area [two segments in the central Chesapeake Bay] are not adversely impacted by Project operations and discharges."

68. Section 7.D.iv further provides that Exelon's "NCAP may propose any combination of corrective action strategies," including: (1) "[d]redging the Reservoir," *id.* § 7.D.iv.c; (2) "[i]nstallation of best management practices and/or ecosystem restoration actions," *id.* § 7.D.iv.b; or (3) "[p]ayment of an in-lieu fee" prescribed by MDE, *id.* § 7.D.iv.a.

69. None of these conditions is related to Exelon's own activities.  Instead, the conditions all relate to the abatement of pollution introduced into the Susquehanna River by others.

70. Moreover, neither dredging nor the installation of "best management practices" or "ecosystem restoration actions" is a workable method for attaining the Bay's dissolved-oxygen standards.  Thus, the in-lieu fee is the Certification's dominant condition.

71.     The Section 7.D.iv conditions present only an illusion of genuine "options" for Exelon.  On information and belief, the conditions were designed to leave Exelon with no choice but to pay Maryland a massive annual fee.

**1.**     Dredging the Conowingo Reservoir

72.     As Maryland itself has conceded (in a report that MDE co-authored with the Army Corps), dredging is an impractical solution whose high costs cannot be justified by water-quality benefits that would likely be both minimal and short-lived.  Dredging and disposing of this much sediment is not feasible, and would itself cause environmental harm.  For numerous reasons, dredging the reservoir is not a realistic option.

73.     It is impossible at this time to precisely project the full costs of dredging the Conowingo Reservoir.  But the MDE/Army Corps LSRWA study estimated that the cost of a limited dredging program could total as much as $2.8 billion.  And based on the projected costs of a pilot dredging program proposed by Maryland (which has yet to obtain regulatory approval or commence), it appears that dredging to merely maintain the Reservoir's current depth could cost more than $900 million per year.

74.     As MDE and the Army Corps noted, those costs are likely to increase over time as convenient sites for disposing of the dredged sediment become scarcer.

75.     Dredging would also significantly diminish the community's enjoyment of the fisheries and other recreational activities at Conowingo Reservoir.

76.     Any ecosystem benefits from dredging would be short-lived.   With the Susquehanna River's 27,000-square-mile watershed, significant and continuous sediment deposition is unavoidable.  According to MDE and the Army Corps, a dredging program would be

hard-pressed even to "keep[] up" with new deposition, much less to return the Reservoir to twentieth-century conditions.

77.     According to the MDE/Army Corps report, dredging would have little beneficial effect on the environment because it would result in only "minor" improvements in ecosystem conditions and would have little effect on water-quality conditions in the Chesapeake Bay.

78.     In its EIS, FERC credited the MDE/Army Corps report's findings that "dredging of Conowingo [Reservoir] would be cost prohibitive and ineffective" and concluded that there was "no justification at this time for requiring Exelon to implement measures such as dredging to help control sediment and nutrient loading in the Bay, which would occur in the long term whether or not Conowingo Dam was in place."

79.     State-imposed dredging would require Exelon to remove pollutants introduced into the Susquehanna River not by Exelon, but by polluters in New York and Pennsylvania.

**2**.     Best Management Practices and/or Ecosystem-Restoration Actions

80.     Generally, Exelon embraces best management practices for the Project lands that Exelon owns.  But the Project lands cover a miniscule portion of the Susquehanna River basin, so these practices are insignificant compared with the Certification's massive Required Nutrient Reductions.

81.     The Certification does not identify "best management practices" or "ecosystem restoration actions" that could potentially achieve the targeted level of nutrient reductions.

**3**.     In-Lieu Fees

82.     Under Section 7.D.iv.a of the Certification, Exelon's NCAP may propose "payment of an in-lieu fee annually at $17.00 per pound of nitrogen and $270.00 per pound of phosphorus in accordance with payment instructions provided by MDE from time to time" and subject to adjustments for inflation.

83.     This condition would result in annual payments from Exelon to MDE of more than $172 million, totaling more than $7 billion over the term of the license — or roughly a half-million dollars *per day* for 40-plus years.

84.     In-lieu fees under the Certification will automatically escalate with inflation and may be further increased under the Certification's reopener provisions, which purport to allow MDE to amend the Certification conditions at any time.

85.     The Certification does not identify or constrain how Maryland will spend this money.

86.     On information and belief, even aggressive pollution-control and pollution-reduction efforts focused solely on the Conowingo Project and other parts of the Susquehanna River watershed that fall within the confines of Maryland would be insufficient to cure the identified dissolved-oxygen problem in the Bay.

87.     The Certification's conditions are unprecedented.  On information and belief, Maryland's Certification for the Conowingo Project is the first Section 401 water-quality certification for a FERC-licensed hydroelectric project, anywhere in the Nation, that has been conditioned on the licensee's removal of pollution not caused by the project's operations.  On information and belief, the Certification also is the first Section 401 water-quality certification for

a FERC-licensed hydroelectric project, anywhere in the Nation, that has been conditioned on the licensee's payment to a State of an annual multimillion-dollar "fee" in lieu of such removal.

88.     Ordinarily, Section 401 certifications for hydroelectric projects set threshold quantities for compliance (for example, for dissolved-oxygen levels in the dam's tailrace), require the licensee to monitor for quantities inconsistent with that threshold and, if monitoring reveals such quantities, require the licensee to undertake measures to bring the quantities back in line with that threshold.

89.     Maryland's Certification for the Conowingo Project departs dramatically from this approach by functionally requiring Exelon to pay the State tens or hundreds of millions of dollars every year for 40-plus years for an unspecified purpose.

### 4.     Other Conditions

90.     Section 7.F of the Certification contains conditions requiring the Conowingo Project to remove, at least 40 times per year, "all" trash and debris that flows down the River into the Project.

91.     Section 7.B of the Certification contains fish-passage conditions that exceed the requirements established in Exelon's settlement with the Department of the Interior, without citing any evidence that the additional measures are needed.  And some of the Certification's conditions will actually make it easier for invasive species to migrate upstream through the Conowingo Project.

92.     Sections 2.C and 7 of the Certification also contain other conditions that provide for planning, additional studies, reopening, and modification by MDE and would allow MDE to impose as-yet-unknown additional requirements on the Conowingo Project.

**F.      FERC's Imminent Incorporation of the Certification's Conditions into Exelon's Operating License**

93.      The Certification states that "[t]his is a final decision on [Exelon's] Application" and that "[a]ny request for an appeal does not stay the effectiveness of this Certification."

94.      On May 8, 2018, MDE submitted the Certification to FERC by filing it in the docket for the Conowingo Project's license renewal.

95.      Under CWA Section 401(d), the conditions of a 401 certification "shall become a condition on any Federal license" to which the certification pertains.  33 U.S.C. § 1341(d).

96.      Because MDE has labeled the Certification a "final decision," has submitted the Certification to FERC, and has stated that it will not stay the Certification's effectiveness during any appeals, FERC could incorporate the Certification's conditions into the Conowingo Project's license at any time under CWA Section 401(d).

97.      MDE's issuance of the Certification and its submittal to FERC cause immediate harm to Exelon.  Exelon will be subject to obligations that exceed Maryland's authority under the Clean Water Act and violate the United States Constitution.

98.      Exelon is directly regulated by Defendants' actions and risks penalties if it fails to comply.

**G.      The Chesapeake Bay TMDL**

99.      Maryland has unilaterally placed these obligations on Exelon despite the existence of a comprehensive federal regulatory scheme for water quality in the Chesapeake Bay and its tidal tributaries.

100.    The CWA establishes distinct roles for the federal and state governments in addressing water quality in waters of the United States.  For the Bay, these federal and state roles have been implemented through EPA's Chesapeake Bay Program, pursuant to CWA Section 117.

33 U.S.C. § 1267.  The Chesapeake Bay Program was established as a regional partnership in 1983 to protect and restore the Bay's ecosystem by, among other things, identifying impaired waters, identifying sources of pollutants that cause the impairments, and developing specific plans for reducing pollutants.

101.    To achieve these goals, in CWA Section 117(g)(1), Congress directed the Administrator of the United States Environmental Protection Agency (the "Administrator" or "EPA") to "ensure" that States in the Chesapeake Bay watershed develop management plans and begin implementation "to achieve and maintain … (A) … nutrient goals … for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed" and "(B) the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem."  33 U.S.C. § 1267(g)(1)(A)-(B).

102.    The Chesapeake Bay watershed spans seven jurisdictions:  Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia, and the District of Columbia (the "Bay Jurisdictions" or "the States").

103.    The States recognized that water pollution in the Bay is a "tragedy of the commons."  Because the Bay is affected by so many sources of pollution throughout its watershed, no single State has sufficient incentive to reduce pollutant loads from its own sources unless it believes that other States will do likewise.

104.    For each waterway in each State, CWA Section 303 requires the State to develop and periodically update "water quality standards."  33 U.S.C. § 1313(c)(2)(A).  But the standards can take effect only if EPA approves them.  *Id.* § 1313(c)(2)(A), 1313(c)(3)-(4).

105.    For any waters that do not meet applicable water-quality standards, the State may establish a "total maximum daily load" ("TMDL") for each relevant pollutant, at a level necessary

to satisfy the applicable water-quality standards.   33 U.S.C. § 1313(d)(1)(C).   A TMDL is essentially a "pollution diet" designed to identify necessary reductions of pollutant loads so that a waterway can meet the applicable water-quality standards.

106.     However, these State-established "loads" cannot take effect unless they are approved by EPA.   33 U.S.C. § 1313(d)(2).   If new facts come to light or new scientific methods are developed that indicate that a previously calculated "load" for a particular pollutant in a particular waterway will no longer result in attainment of applicable water-quality standards, the "load" must be amended as necessary to satisfy the water-quality standards.   As with the initial load allocation, a load reallocation must be approved by EPA.   *Id.* § 1313(d)(2).

107.     EPA exercised its authority under CWA Section 303(d)(2) to establish a comprehensive federal TMDL for the entire Bay watershed that, unique among TMDLs, imposed pollutant reductions on the Bay jurisdictions, including the State of Maryland.   Each State in turn had to find ways to secure reductions at the sources of pollution within that State.

108.     Following formal public notice and comment, EPA established the Bay TMDL for the Chesapeake Bay on December 29, 2010 (the "Bay TMDL").   In the Bay TMDL, EPA established a comprehensive "pollution diet" to restore the health of the Bay and the waterways that feed it.

### H.       The Chesapeake Bay TMDL's Pollution Allocations

109.     To calculate pollutant loads, EPA used then-available data and complex computer models that described hydrologic and water-quality processes, estimated the load of each pollutant to each water body, and predicted how the load would change as various remediation methods are implemented.   EPA acknowledged in the 2010 Bay TMDL that its "models produce estimates, not perfect forecasts"; that improving data and modeling methods could necessitate "[c]hanging

modeling numbers"; that EPA's models would "be updated continuously according [to] the state of the art of modeling technology"; and that EPA therefore would, over the years, "modify the TMDL" and "adjust[] … the allocations" if necessary based on updates to the models.

110.    In 2010, EPA calculated that, to reach its goals for the Bay's water quality by 2025, significant nutrient reductions of discharges of nitrogen and phosphorus would be required.  EPA allocated those total amounts with some specificity.   For each of the 92 segments of the Chesapeake Bay watershed, EPA calculated the reductions in nitrogen, phosphorus, and sediment loads, or "allocations," that specific point sources of pollution (such as a factory) and nonpoint-source sectors (such as agriculture) would have to undertake, so that the Bay would satisfy all applicable water-quality standards by 2025.  Each segment is located in one and only one of the seven Bay jurisdictions and in one and only one of the eight major river basins (Susquehanna, Potomac, James, Rappahannock, York, Patuxent, Eastern Shore, or Western Shore).

111.    The Bay TMDL does not hold any discharger singularly responsible for restoring the Bay, but instead distributes the obligations to prevent pollution among the seven Bay jurisdictions.

112.    In turn, the States became obligated to implement the Bay TMDL through a series of phased-in Watershed Implementation Plans ("WIPs").  WIPs are mandatory, detailed planning documents that each Bay jurisdiction must develop, subject to EPA approval, under CWA Section 303(e).  33 U.S.C. § 1313(e).  WIPs identify specific programs to require or encourage polluters to control pollution at its source, ranging from tax incentives to grants to new state regulations and local land-use ordinances.

113.    The Bay TMDL spans 15 years, from 2010 to 2025, when each segment of the Bay is to attain its goals under the States' EPA-approved water-quality standards.  There are numerous

checkpoints over that period.  First, the Bay TMDL requires that States create three WIPs over the life of the project.  States submitted Phase I WIPs to EPA in 2010 and updated, more-detailed Phase II WIPs to EPA in 2012.  These WIPs described actions and controls to be implemented by 2017 and 2025.  States will submit Phase III WIPs to EPA to provide updated, more-detailed information on actions the States will take through 2025.  Second, States are required to follow biennial milestones, which began in 2012, to track progress and evaluate the effectiveness of the WIPs.  EPA reviews the milestones and assesses whether they have been met and whether they are sufficient to achieve pollution reduction.  Third, EPA set a goal of achieving at least 60% of all pollutant reductions for the 15-year timeframe by 2017, roughly the midpoint between 2010 and 2025.

114.    EPA made clear that revisions to the TMDL's allocations could be proposed by a State, but could be approved only by EPA:  "[I]t might be appropriate for EPA to revise the Bay TMDL (or portions of it).  EPA would consider a request by the jurisdictions to propose such a revision to the TMDL following appropriate notice and comment.  Alternatively, a jurisdiction could propose to revise a portion(s) of the Bay TMDL that applies within its boundaries (including, but not limited to specific [allocations]) and submit those revisions to EPA for approval."

**I.      The Conowingo Project and the Chesapeake Bay TMDL**

115.    The 2010 Bay TMDL recognized that the Conowingo Project had long kept some pollutants from flowing into the Chesapeake Bay but would eventually fill in under a natural deposition process and thereafter would have diminished ability to serve this protective role.

116.    For purposes of the 2010 Bay TMDL, EPA assumed that the Conowingo Project would maintain trapping capacity through 2025.  But EPA provided a contingency plan: "If future monitoring shows the trapping capacity of the dam is reduced, then EPA would consider adjusting

the Pennsylvania, Maryland, and New York 2-year milestone loads." These potential adjustments, EPA explained, would "ensure that each jurisdiction is meeting its obligations."

117.   In the years immediately following adoption of the 2010 Bay TMDL, the Chesapeake Bay Program came to believe that the Conowingo Project had already reached "dynamic equilibrium," which means that, over a long period (such as a decade), the amount of pollutants flowing toward the dam from the north and the amount flowing away from the dam to the south would be roughly equal. As a consequence, the dam had effectively lost its long-term trapping capacity, although it continues to provide environmental benefits related to sediment and nutrients.

118.   When preparing for the Bay TMDL's 2017 Midpoint Assessment, EPA learned that upgraded computer models and better data (relating to both the Conowingo Project and many other issues, such as the impacts of economic growth and climate change) showed that the 2010 projections had been overly optimistic. The nutrient reductions that EPA had established in 2010 would need to be increased by at least two or three percent. If the 2010 Bay TMDL allocations for nitrogen and phosphorus were not amended, dissolved-oxygen levels in parts of the Bay would not satisfy applicable water-quality standards by 2025.

119.   Using the upgraded computer models and better data, potential allocations were recalculated. Two of the options considered were (1) concentrating the burden of reallocation (for both nitrogen and phosphorus) solely in the Susquehanna River watershed and (2) spreading that burden across the entire Chesapeake Bay watershed.

120.   Under the first option, new calculations showed that the shortfall could be compensated for by reducing nutrient loads in the Susquehanna River by about 6,000,000 pounds of nitrogen and about 260,000 pounds of phosphorus per year — ***precisely the reduction allocated***

***to Exelon in MDE's 401 Certification***.  Because only a small fraction of the Susquehanna River's length and only a small fraction of the sources that pollute the River are located in Maryland, this approach would require Maryland sources of pollution to reduce their loads by only about 120,000 pounds of nitrogen and about 5,000 pounds of phosphorus per year.  The rest of the reductions would come from pollution sources in Pennsylvania and New York.

121.    By contrast, under the second option, if the shortfall were compensated for by reducing nutrient loads across the entire Chesapeake Bay watershed, rather than just in the Susquehanna River watershed, Maryland would be forced to go on a much stricter "pollution diet." That is because Maryland represents a much smaller fraction of the Susquehanna River watershed than of the total Chesapeake Bay watershed.

122.    Spreading the burden across the entire Bay watershed, rather than concentrating it in the Susquehanna River watershed, would increase the burden on Maryland more than 14-fold for nitrogen and about 18-fold for phosphorus.

123.    As the Chesapeake Bay TMDL is a federal TMDL, all revisions to the Bay TMDL loads must be approved by EPA.  MDE has no authority to make decisions regarding allocations among States or among watersheds.

124.    Neither Maryland nor any of the other Bay jurisdictions formally asked EPA to modify the 2010 Bay TMDL's allocations to adjust for the shortfall.  And to date, EPA has not approved any revisions to the 2010 Bay TMDL's allocations based on the new calculation of needed reductions in the amounts of nitrogen and phosphorus.

125.    Instead of asking EPA to reallocate nutrient reductions and run the risk of taking on additional burdensome obligations, MDE has now essentially "self-reallocated" the additional 6,000,000 pounds of nitrogen and 260,000 pounds of phosphorus to the tiny portion of the

Susquehanna River basin located in Maryland, where the Conowingo Project is located, and then placed the burden on Exelon to remove those pollutants.

126.    On information and belief, the Certification presented a convenient opportunity to shift the burden of pollution reduction from the States onto a private entity.  The Conowingo Project, located in Maryland, was up for relicensing by FERC, so the Project's owner and operator, Exelon, needed to obtain a Section 401 certification from Maryland as a prerequisite to federal relicensing.  The Certification uses this opportunity to impose billions of dollars of fees on Exelon.

127.    Instead of awaiting EPA's determination on amended allocations for nitrogen and phosphorus and running the risk that Maryland would have to shoulder its fair share of the obligation for protecting the Bay, Maryland is now attempting to saddle Exelon with responsibility for the entire annual shortfall of 6-plus million pounds of pollutants, by making those reductions an express condition of Maryland's Section 401 certification.

## CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF SECTIONS 117, 303, AND 401 OF THE CLEAN WATER ACT

128.    Plaintiff repeats and incorporates by reference every allegation in the preceding paragraphs.

129.    Section 401 of the CWA provides that a State may grant a water-quality certification with limitations or requirements, which will become conditions on the federal license. 33 U.S.C. § 1341(d).  The CWA authorizes States to impose only those conditions that are "necessary" to assure that the applicant for a federal license will comply with certain CWA requirements and with any other appropriate requirement of state law.  *Id.* § 1341(d).  Among the

CWA provisions that States consider when deciding whether to grant a 401 certification (or to grant it with conditions) is CWA Section 303, which governs TMDLs.

130.    Under Sections 117 and 303 of the CWA, 33 U.S.C. §§ 1267, 1313, EPA in 2010 established the Chesapeake Bay TMDL, which set express limits for the amount of nitrogen and phosphorus flowing into the Bay, with the goal of restoring the Bay's water quality by 2025.  EPA allocated these limits by type of pollution source within each jurisdiction and major river basin.

131.    Having been set by EPA, the 2010 Bay TMDL allocations could lawfully be changed, and any new reductions allocated, only by EPA.  EPA has not made any such changes.  MDE's conducting a reallocation outside the federal TMDL process is both unnecessary and unlawful.

132.    MDE's Certification claims (or assumes) that the nitrogen- and phosphorus-related conditions imposed on Exelon are ***necessary*** to assure that Exelon will comply with Maryland water-quality standards that mandate certain dissolved-oxygen levels in the Chesapeake Bay.  That is incorrect.

133.    Attainment of the dissolved-oxygen standards in the Bay does not require that Exelon reduce nitrogen and phosphorus loads in the Susquehanna River at the Conowingo Project.  Rather, reductions sufficient to attain those standards can be lawfully achieved only by EPA revising the 2010 Bay TMDL's allocations for nitrogen and phosphorus and by requiring the actual sources of the pollution to limit their discharges.

134.    Formal public notice and comment is required for such revisions.

135.    Under the CWA, it is the role of EPA — not of any one State — to determine which Bay jurisdictions, which major river basins, and which types of pollution sources should bear the burden of reducing nitrogen and phosphorus loads.

136.    By unilaterally reallocating the nitrogen and phosphorus loads established in the 2010 Bay TMDL, Defendants have usurped the authority that Congress delegated to the Administrator of the United States Environmental Protection Agency and have violated Sections 117, 303, and 401 of the Clean Water Act.

**COUNT TWO:**
**VIOLATION OF SECTION 401 OF THE CLEAN WATER ACT**

137.    Plaintiff repeats and incorporates by reference every allegation in the preceding paragraphs.

138.    MDE's authority to issue a 401 certification and to impose conditions through that certification is derived from the Clean Water Act.

139.    The Certification violates Section 401 in several distinct respects.

140.    First, the Clean Water Act limits the introduction of pollutants into the navigable waters.  It does not demand the removal of pollutants from the navigable waters.  The Clean Water Act is a pollution-control statute, not a pollution-cleanup statute.  In enacting other environmental statutes, Congress has exercised its authority to require regulated parties to remove pollutants (or pay for the removal of pollutants) from navigable waters in circumstances not pertinent here — but it has not done so under Section 401 of the Clean Water Act.

141.    The Clean Water Act does not hold dam operators liable for cleaning up or removing pollutants that were added by upstream sources.  And CWA Section 401 does not authorize the State of Maryland to require Exelon to remove pollutants from the Susquehanna River.

142.    Second, CWA Section 401 addresses activities involving a point source that may result in a discharge to navigable waters.  Section 401 does not govern nonpoint-source pollution. Yet Maryland has purported to impose obligations on Exelon under Section 401 to clean up

27

pollution deposited in the Susquehanna River by nonpoint sources upstream of the Conowingo Project.

143.     Third, the "discharge" into navigable waters that States may regulate under Section 401 is defined to include "discharge of a pollutant" or pollutants, 33 U.S.C. § 1362(16), which is itself defined to mean "any *addition* of any pollutant to navigable waters," *id.* § 1362(12) (emphasis added).  Thus, while a State may impose conditions under Section 401 relating to attributes of a licensee's discharge that do not relate to pollutants (such as water flow), a State's authority to regulate a pollutant under Section 401 arises only if the pollutant is contained in a "discharge of a pollutant," as defined by the statute.  Here, the passage of nitrogen and phosphorus through the dam is not a "discharge of a pollutant" because Exelon is not adding any pollutant to the Susquehanna River.  So MDE cannot impose conditions under Section 401 that purport to regulate Exelon's discharge of such pollutants.

144.     Fourth, under Section 401(d), the only conditions that a State may impose through a 401 certification are those "necessary" to assure that the applicant will comply with "effluent limitations and other limitations, and monitoring requirements necessary to assure" that the applicant "will comply with any [1] applicable effluent limitations and other limitations, under [CWA Section 301 or 302], [2] standard or performance under [CWA Section 306], or [3] prohibition, effluent standard, or pretreatment standard under [CWA Section 307], and with any [4] other appropriate requirement of State law."  33 U.S.C. § 1341(d).

145.     The Certification's conditions are not necessary to assure that Exelon's operation of the Conowingo Project will comply with the provisions of the CWA that are designated in Section 401(d).

a.      There are no effluent limitations or other limitations under CWA Section 301 that apply to the Conowingo Project.

b.      There are no effluent limitations or other limitations under CWA Section 302 that apply to the Conowingo Project.

c.      There are no standards of performance under CWA Section 306 that apply to the Conowingo Project.

d.      There are no prohibitions, effluent standards, or pretreatment standards under CWA Section 307 that apply to the Conowingo Project.

146.    Fifth, in determining whether a condition is necessary to assure that an applicant for a federal license will comply with an "appropriate requirement of State law," 33 U.S.C. § 1341(d), the State's authority is bounded by the scope and nature of the "activity" for which the applicant is seeking the federal license, *id.* § 1341(a)(1).  There must be an adequate nexus between the condition and the applicant's activity.

147.     The nutrients and trash that move downstream to the Project and the presence of invasive species are not the result of Exelon's activity.

148.    The Certification's Section 7.D conditions violate Section 401 by making Exelon responsible for pollution that is generated by the activities of other parties in Pennsylvania and New York and not by Exelon's activity.

149.    The Certification's Section 7.D conditions violate Section 401 by providing for ongoing review and approval at the whim of MDE.

150.    Accordingly, the Certification's conditions exceed the scope of Maryland's authority under Section 401 of the Clean Water Act.

**COUNT THREE:**
**VIOLATION OF THE SUPREMACY CLAUSE**
**OF THE UNITED STATES CONSTITUTION**
**(CONFLICT PREEMPTION)**

151.    Plaintiff repeats and incorporates by reference every allegation in the preceding paragraphs.

152.    Under the Supremacy Clause of the United States Constitution, a state action is preempted when it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  U.S. Const. art. VI, cl. 2.

153.    The CWA authorized EPA to establish a watershed-wide federal Chesapeake Bay TMDL that sets overall limits on the amount of nitrogen and phosphorus in the Chesapeake Bay watershed, to meet applicable water-quality standards.  33 U.S.C. §§ 1257, 1313.  EPA has exclusive authority to allocate among the seven jurisdictions in the Chesapeake Bay watershed and among the watershed's eight major river basins the amount of nitrogen and phosphorus that each jurisdiction and basin may contribute to the Bay.

154.    Maryland's issuance of the Certification was a state action.

155.    Section 7.d.ii of Maryland's Certification stands as an obstacle to EPA's exclusive authority to allocate the amount of nitrogen and phosphorus that may flow into the Chesapeake Bay from each of the seven jurisdictions and eight major river basins.

156.    Through Section 7.d.ii of the Certification, the State of Maryland allocates to Exelon responsibility for all additional reductions of nitrogen and phosphorus flowing into the Chesapeake Bay.

157.    Maryland's Certification is preempted by the Supremacy Clause because it invades EPA's exclusive authority to allocate pollutant loads among the seven jurisdictions and eight major river basins in the Chesapeake Bay watershed, and interferes with EPA's exercise of that authority.

**COUNT FOUR:**
**VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS**
**TO THE UNITED STATES CONSTITUTION**
**(REGULATORY TAKINGS)**

158.    Plaintiff repeats and incorporates by reference every allegation in the preceding paragraphs.

159.    The Takings Clause of the Fifth Amendment to the United States Constitution, incorporated to the States under the Fourteenth Amendment, provides that private property shall not be taken for public use without just compensation.  U.S. Const. amends. V, XIV.

160.    As its owner, Exelon has a vested property interest in the Conowingo Project.

161.    In issuing the Certification, MDE has acted under color of state law to condition Exelon's operation of the Conowingo Project.

162.    The Certification's conditions have deprived Exelon of all economically viable use of the Conowingo Project by imposing on Exelon alone a minimum fee of more than $172 million annually, or more than $7 billion over the license term, to remediate pollution in the Susquehanna River that originates from sources spread across much of Pennsylvania and New York.

163.    For the first time in the Conowingo Project's 90 years of operation, the Certification's conditions have interfered with its owner's distinct investment-backed expectations by making Exelon retroactively liable for pollution in the Susquehanna River long-known by MDE to be caused by upstream polluters.

164.    The Certification's conditions single out Exelon to bear the substantial economic burden of removing upstream pollutants unrelated to the Conowingo Project's activities and are thus a *sui generis* regulation of a hydroelectric project by a State.

165.    Through the Certification's conditions, Maryland has taken the Conowingo Project from Exelon to serve Maryland's public interest in reducing upstream pollution caused by out-of-state polluters in a public waterway.

166.    Maryland has not compensated Exelon for appropriating the Conowingo Project for this public use.  Nor can Exelon obtain compensation from the State of Maryland for the economic effects that the Certification's conditions are having and will continue to have on the Conowingo Project.

167.    As a consequence, MDE's issuance of the Certification has effected a regulatory taking of the Conowingo Project, Exelon's private property, for public use without just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

**COUNT FIVE:**
**VIOLATION OF THE FOURTEENTH AMENDMENT**
**TO THE UNITED STATES CONSTITUTION**
**(SUBSTANTIVE DUE PROCESS)**

168.    Plaintiff repeats and incorporates by reference every allegation in the preceding paragraphs.

169.    The Due Process Clause of the Fourteenth Amendment provides protection from economically burdensome regulations that are arbitrary and irrational.  U.S. Const. amend. XIV.

170.    In issuing the Certification's conditions, MDE has acted under color of state law.

171.    The Certification's conditions serve no legitimate governmental objective because although their purported aim is to reduce pollution in the Chesapeake Bay, none of the methods they propose for doing so regulate upstream polluters, the true sources of the pollution.

172.    The Certification's conditions also serve no legitimate governmental objective because none of the methods they propose is sufficiently tethered to nutrient reduction to meaningfully improve the dissolved-oxygen levels in the Bay.

173.    The Certification's conditions propose that Exelon pay Maryland an annual multi-million-dollar "in-lieu" fee, but the fee is for no stated purpose — nutrient reduction or otherwise.

174.    The Certification's conditions propose that Exelon dredge the Conowingo Reservoir even though MDE itself, along with the Army Corps, has concluded that dredging would be cost prohibitive and ineffective in controlling nutrient loading in the Chesapeake Bay.

175.    The Certification's conditions propose that Exelon adopt "best management practices and/or ecosystem restoration actions" to address pollution in the Susquehanna River that is caused by countless upstream polluters that are neither known to nor under the control of Exelon.

176.    Accordingly, by requiring Exelon to undertake costly actions that are unrelated to Exelon's own activities and that cannot serve MDE's stated governmental objectives, MDE has acted so arbitrarily and irrationally as to deprive Exelon of substantive due process in violation of the Fourteenth Amendment to the United States Constitution.

## COUNT SIX:
## VIOLATION OF THE SUPREMACY CLAUSE
## OF THE UNITED STATES CONSTITUTION
## (DISCRIMINATION AGAINST FEDERALLY LICENSED DAMS)

177.    Plaintiff repeats and incorporates by reference every allegation in the preceding paragraphs.

178.    Under the Supremacy Clause of the United States Constitution, States are not permitted to discriminate against the Federal Government or private entities with whom the Federal Government deals.  U.S. Const. art. VI, cl. 2.

179.    As the owner and operator of the Conowingo Project, Exelon is a licensee of the Federal Government.

180.    Maryland discriminated against Exelon because it imposed stricter conditions related to water-quality standards on Exelon at the Conowingo Dam than it imposes on State-licensed dams.  Maryland therefore treats these dams preferentially to the federal licensee.

181.    Maryland has never required a State-licensed dam to remove an amount of nitrogen from the dam's discharges.

182.    Maryland has never required a State-licensed dam to remove an amount of phosphorus from the dam's discharges.

183.    Maryland has never required a State-licensed dam to pay a fee to the State in lieu of removing pollutants such as nitrogen or phosphorus from the dam's discharges.

184.    Maryland has never required a State-licensed dam to remediate the impacts of nitrogen or phosphorus that was introduced into a waterway by upstream polluters before the licensee's discharges originated.

185.    Maryland discriminated against Exelon because it did not follow the CWA Section 303 TMDL process to allocate pollutants in the Certification for the Conowingo Project but routinely follows the CWA Section 303 TMDL process to allocate pollutants for State-licensed dams.

186.    CWA Section 401 does not authorize Maryland to discriminate against federal licensees in enforcing state water-quality standards.

187.    Therefore, the Certification's conditions violate the Supremacy Clause of the United States Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks that this Court:

a.　　Declare that Defendants' Certification of Plaintiff's Conowingo Hydroelectric Project includes requirements that exceed the State of Maryland's authority under the Clean Water Act and violate the United States Constitution;

b.　　Order Defendants to withdraw their Certification of Plaintiff's Conowingo Hydroelectric Project;

c.　　Order Defendants promptly to notify the Federal Energy Regulatory Commission of this withdrawal;

d.　　Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

e.　　Grant such other and further relief as may be just and proper.

May 25, 2018

Respectfully submitted,

By:  /s/ David W. DeBruin

Robert Brager
    (D.C. Bar No. 321042)
Richard S. Davis
    (D.C. Bar No. 362352)
Jayni Lanham
    (D.C. Bar No. 984083)*
     * pending renewal
Pamela D. Marks
    (D.C. Bar No. 987615)

BEVERIDGE & DIAMOND, P.C.
201 North Charles St., Suite 2210
Baltimore, MD 21201
Phone: (410) 230-1300
rbrager@bdlaw.com
rdavis@bdlaw.com
jlanham@bdlaw.com
pmarks@bdlaw.com

*Counsel for Plaintiff Exelon
Generation Company, LLC*

David W. DeBruin
    (D.C. Bar No. 337626)
Sam Hirsch
    (D.C. Bar No. 455688)
Matthew E. Price
    (D.C. Bar No. 996158)
Marguerite L. Moeller
    (D.C. Bar No. 1034336)

JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Phone: (202) 639-6000
ddebruin@jenner.com
shirsch@jenner.com
mprice@jenner.com
mmoeller@jenner.com

*Counsel for Plaintiff Exelon
Generation Company, LLC*