**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| EXELON GENERATION CO., LLC, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Civil Action No.  18-1224 (RMC) |
| ) | |
| BENJAMIN H. GRUMBLES, *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

## MEMORANDUM OPINION

The State of Maryland cherishes the Chesapeake Bay and is determined to save the Bay by removing pollutants.  The Susquehanna River delivers about 75% of the freshwater in the Bay; its environmental health is critical.  The River is over 400 miles long, originating in New York State, flowing through the Commonwealth of Pennsylvania, and then, for its last 15 miles, traversing part of Maryland before emptying into the Bay at Havre de Grace.  This multistate watershed creates a pollutant problem.  The River transports great amounts of phosphorus and nitrogen—farm nutrients-turned-pollutants—and other detritus from New York and Pennsylvania to the Bay.

Exelon Generation Co., LLC operates the Conowingo Project, a Maryland dam and hydroelectric power plant that is ten miles upriver from the Bay.  The Conowingo Project has applied to the Federal Energy Regulatory Commission for a new operating license.  As the cost of such a federal license, Maryland insists that the Conowingo Project remove the phosphorus and nitrogen that flow downriver from New York, Pennsylvania, and Maryland.  In lieu of cleaning the Susquehanna, Maryland would accept $172 million from Exelon each year for the next 50 years.

The Conowingo Project adds no phosphorus or nitrogen to the Susquehanna River; it only passes the water along. Exelon protests that it should not be made to pay up to $7 billion to clean up pollution sent downriver by others. Exelon has sued Benjamin H. Grumbles and D. Lee Currey in their official capacities as Secretary of the Environment and Director, Water and Sciences Administration of the Maryland Department of the Environment, respectively.

Right now, the question is whether Exelon's lawsuit is brought in the right court. Maryland argues that it belongs in its State courts. Alternatively, it argues that the case should be brought in the United States District Court for the District of Maryland. The issue is fully briefed[1] and the Court heard oral argument. For the reasons explained below, this Court disagrees on both points and concludes that venue lies in D.C. as well as Maryland. The Court will deny so much of Maryland's motion to dismiss as is based on improper venue.

## I.   FACTS

### A.  Background

Exelon Generation Company, LLC (Exelon), owns and operates the Conowingo Dam and hydroelectric facility (the Conowingo Project). Exelon is a Pennsylvania limited liability company and a fully owned subsidiary of Exelon Corporation, a Pennsylvania corporation. The Conowingo Project produces electricity, which it provides directly to the mid-Atlantic power grid and indirectly to a majority of Maryland homes and businesses; it generates more renewable electricity than all other facilities in the State of Maryland combined.

---

[1] *See* Compl. [Dkt. 1]; The State of Maryland's Mot. to Dismiss (Defs.' Mot.) [Dkt 11]; The State of Maryland's Mem. in Supp. of Its Mot. to Dismiss (Defs.' Mem.) [Dkt. 11-1]; Opp'n to Defs.' Mot. to Dismiss (Opp'n) [Dkt. 17]; Reply Mem. in Supp. of the State's Mot. to Dismiss (Reply) [Dkt. 23].

The Susquehanna River was first dammed at Conowingo ninety-odd years ago to create a reservoir for Baltimore, Maryland, and to produce hydroelectric power.  The main branch of the Susquehanna originates in New York State and flows for over 400 miles through New York and Pennsylvania, where it is joined by a junior east-west branch from across Pennsylvania, and then into Maryland.  *See* Defs.' Mem at 3.  Only about fifteen miles of the River are in Maryland before it empties into the Chesapeake Bay.  The impoundment created by the Dam, *i.e.*, the Baltimore reservoir, fully occupies the first five miles of the Susquehanna in Maryland, from the Pennsylvania/Maryland border to the Conowingo Dam.  Compl. ¶ 19.  The mouth of the Susquehanna is ten miles downstream from the Conowingo Dam at Havre de Grace.  *See id*.  Over its lifespan, the Dam has trapped and retained some of the harmful nutrients-turned-pollutants in the runoff from upstream farms and businesses in New York, Pennsylvania, and Maryland, preventing such pollutants from reaching the Bay.  *Id*. ¶¶ 22-23.  Now, however, its trapping capacity is declining, as sediment flowing downstream has been deposited in the reservoir and reduced its depth.  *Id*. ¶ 25.

Exelon has applied to the Federal Energy Regulatory Commission (FERC) to renew its operating license for the Conowingo Project for 50 years under the Federal Power Act (FPA), 16 U.S.C. §§ 791a-823g; *see also* Compl. ¶ 30.  Under Section 401 of the Clean Water Act (CWA), 33 U.S.C. § 1341(a)(1), the State of Maryland must certify that the Conowingo Project is compliant with State water-quality laws and regulations before FERC can grant the license.  *Id.* ¶¶ 39-41.  Presently, however, Maryland and all the states in the Chesapeake Bay watershed are facing the likelihood of increased demands from the Environmental Protection Agency (EPA) to eliminate more nitrogen and phosphorous from their waters that enter the Bay.  *See id*. ¶¶ 117-22.  Maryland has welcomed the opportunity of the FERC re-licensing process to

require that the Conowingo Project remove such pollutants from the Susquehanna River in the amounts that EPA would normally apportion among the multiple states around the Bay or the three states through which the Susquehanna flows. *Id.* ¶¶ 110, 119. Alternatively, the Conowingo Project at the tail end of the River can avoid this obligation to clean up 400-plus miles of pollutants from neighboring states by paying Maryland approximately one-half million dollars ($500,000) each day over the life of its next FERC license, or approximately $7 billion in the next 50 years. The Maryland Department of the Environment (MDE) has submitted its Certification to FERC with such requirements. *Id.* ¶ 94. FERC is obligated to include these terms in a new license for the Conowingo Project, which is now under consideration.

Exelon appealed through the state administrative and court processes and filed suit under federal law here.

### B. The Exelon Application to FERC for a New License

In anticipation of its renewal application, Exelon developed a study plan in or about 2009 and performed more than 45 separate studies regarding various environmental issues, including fish passage, stream flow, the water transport of sediment, and water temperature. Exelon filed its application with FERC on August 31, 2012.

In 2015, FERC issued an Environmental Impact Statement (EIS) for three hydroelectric projects on the lower Susquehanna, including the Conowingo Project in Maryland. The EIS noted that the Susquehanna River "is the largest source of freshwater to the Chesapeake Bay, contributing about 70% of the total nitrogen and 55% of the total phosphorus, and that the presence of these pollutants is a watershed-wide issue." Compl. ¶ 36. The EIS warned that if the Conowingo Reservoir could no longer trap sediment and pollutants, "governmental jurisdictions in the watershed might need to increase their . . . nutrient-reduction efforts." *Id.*

The EIS also evaluated whether dredging might be a reasonable way to increase the trapping capacity of the Conowingo Reservoir to continue its ability to reduce pollutants in the Bay. However, citing the Lower Susquehanna River Watershed Assessment—a joint assessment by the Army Corps of Engineers and the MDE—the FERC EIS concluded that "operational changes at Conowingo would not address the sediment transport issue, and that dredging of Conowingo [Reservoir] would be cost prohibitive and ineffective." *Id.* ¶ 37 (internal quotation marks omitted).

Exelon also engaged in detailed negotiations with the Department of the Interior (DOI) Fish & Wildlife Service regarding fish spawning in the Susquehanna River as part of its relicensing process. Those parties reached a settlement whereby Exelon committed to enhancing fish passage over the Dam by trapping and transporting fish upstream to reduce the time it takes them to reach spawning locations. *Id.* ¶ 38. Exelon agreed to haul fish upstream from the Conowingo Reservoir and past three additional dams to ensure that a high percentage of fish complete their migrations successfully. *Id.*

### C. The MDE Certification

On April 29, 2013 FERC issued a formal request to MDE for a state water-quality certification (Certification) for the Conowingo Project.

On January 31, 2014, Exelon submitted its request to MDE for a Section 401 certification in connection with the FERC relicensing of the Conowingo Project. Along with its request, Exelon submitted copies of the studies that it had already completed. Under the Clean Water Act, Maryland had one year to submit a certification or waive its rights. *See* 33 U.S.C. § 1341(a)(1); *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099 (D.C. Cir. 2019).

MDE asked Exelon to conduct an additional study on the impacts of sediment transport on water quality in the Susquehanna River and the Bay (the Sediment Study). Compl.

¶ 45.  As a result, Exelon entered into an agreement with MDE to work with Maryland agencies, the Army Corps of Engineers, the United States Geological Survey, the University of Maryland Center for Environmental Science, and EPA to design and conduct a multi-year Sediment Study, at a cost to Exelon of $3.5 million.  *Id.* ¶¶ 46-47.

In order to provide time for the Sediment Study requested by Maryland, Exelon withdrew its January 2014 application in December 2014.  *Id.* ¶ 48.  Exelon refiled the application for a Section 401 certification on March 3, 2015 and then withdrew it on February 5, 2016 because the Sediment Study was not completed.  *Id.* ¶ 49.  Exelon refiled its application on April 25, 2016 and again withdrew it on February 17, 2017.  *Id.* ¶ 50.

Finally, on March 13, 2017, MDE indicated that it would be ready to receive Exelon's application for the Certification no later than May 18, 2017.  *Id.* ¶ 52.  Exelon resubmitted its application on May 17, 2017.  *Id.* ¶ 53.

Exelon alleges that "[t]he studies that [it] submitted to MDE . . . and the information in the record before MDE demonstrate that the Conowingo Project is not the source of pollution entering the Susquehanna River.  They also demonstrate that the Project is meeting all applicable state water-quality standards in waters immediately downstream."  *Id.* ¶ 54.  In addition, "[t]he Sediment Study confirmed that Conowingo Project operations introduce negligible amounts of sediment into the water, solely from natural causes, and do not cause downstream water-quality violations that may result from sediment transport."  *Id.* ¶ 55. Similarly,

> [t]he Water Quality Study shows that the average dissolved-oxygen ("DO") [sic] conditions within all of the turbine boils are always at or above standards, that DO standards in the tailrace (where water from the turbines is discharged) are met, that DO standards are being met immediately downstream of the Project, that minimum and maximum turbidity values recorded downstream are within state

water-quality standards, and that operation of the Conowingo
Project has no measurable effect on the temperature of the water
being released downstream.

*Id.* ¶ 56. Finally, "the aquatic-resources studies show that the Conowingo Project is not

adversely impacting fish propagation." *Id.* ¶ 57.

MDE issued its Certification for the Conowingo Project on April 27, 2018,

pursuant to CWA Section 401; Title 9, Subtitle 3 of the Maryland Code, Environment Article;

and Section 26.08.02 of the Code of Maryland Regulations. *Id.* ¶ 58. It was published in the

Maryland Register on May 11, 2018, as required by applicable state procedures. *Id.* ¶ 60. The

Certification states that it is a final decision and "[a]ny request for an appeal does not stay the

effectiveness of this Certification." *Id.* ¶ 93.

The Certification "require[s] Exelon to undertake Required Nutrient Reductions

that would annually reduce the amount of nitrogen and phosphorus in the Project's discharges

[water over or through the Dam's turbines] by 6,000,000 pounds and 260,000 pounds,

respectively." *Id.* ¶¶ 63, 120. Exelon is to provide a nutrient corrective action plan to MDE by

December 31, 2019 to achieve the required nutrient reductions and "ensur[e] that the [Dissolved

Oxygen] levels in the DO Non-Attainment Area [in the central Chesapeake Bay] are not

adversely impacted by Project operations and discharges.'" *Id.* ¶ 67.

To achieve these requirements, the Certification suggests that Exelon could

dredge the Conowingo Reservoir, adopt unidentified best management practices, or pay an "in-

lieu fee" of $17.00 per pound of nitrogen and $270.00 per pound of phosphorus, amounting to

annual payments of $172 million or almost half a million dollars per day for the life of the new

license. *Id.* ¶¶ 68, 83.

Exelon contends that the two suggestions in the Certification "present only an illusion of genuine 'options' for Exelon" and alleges that they "were designed to leave Exelon with no choice but to pay Maryland a massive annual fee." *Id.* ¶ 71; s*ee also id.* ¶¶ 72-78; *id.* ¶ 78 (FERC EIS concurring with the joint MDE/Army Corps report that there was "no justification at this time for requiring Exelon to implement measures such as dredging to help control sediment and nutrient loading in the Bay, which would occur in the long term whether or not Conowingo Dam was in place"); *id.* ¶¶ 37, 81 (MDE offering no best practices and FERC EIS concluding "that operational changes at Conowingo would not address the sediment transport issue.").

On May 8, 2018, MDE submitted the Certification to FERC's docket by filing it electronically in the Conowingo Project's license renewal docket in the District of Columbia. *Id.* ¶ 94.

### D.  The Chesapeake Bay Total Maximum Daily Load (TMDL)

Exelon alleges that the Certification interferes with EPA's Chesapeake Bay Program, negotiated with the authority of, and enforcement by, EPA in D.C.

#### 1.  Pollution Allocations

The watershed of the Chesapeake Bay encompasses seven jurisdictions: Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia, and the District of Columbia.  Compl. ¶ 102.  The CWA establishes distinct roles for the states and federal government in addressing the Bay's water-quality issues, which are implemented through the Chesapeake Bay Program (the Bay Program).  The Bay Program is a regional partnership between the EPA and the Bay watershed states created in 1983, pursuant to CWA Section 117, 33 U.S.C. § 1267, to "protect and restore the Bay's ecosystem by, among other things, identifying impaired waters, identifying sources of pollutants that cause the impairments, and

developing specific plans for reducing pollutants."  Compl. ¶ 100.  Congress directed EPA to

"ensure" that states in the Chesapeake Bay watershed develop management plans and begin

implementation "to achieve and maintain . . . (A) . . . nutrient goals . . . for the quantity of

nitrogen and phosphorus entering the Chesapeake Bay and its watershed" and "(B) the water

quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem."

33 U.S.C. § 1267(g)(1)(A)-(B); Compl. ¶ 101.

  For each waterway that ultimately reaches the Bay from each state, CWA Section

303 requires the respective state to develop and periodically update water-quality standards,

which take effect only upon EPA approval.  33 U.S.C. § 1313(c)(2)(A), (c)(3)-(4); Compl. ¶ 104.

For waterways that do not meet applicable water-quality standards, states may establish a "total

maximum daily load," (TMDL) which establishes the maximum amount of a specific pollutant

allowed.  33 U.S.C. § 1313(d)(1)(C); Compl. ¶ 105.  Section 33 U.S.C. § 1313(c)(2)(A) of the

CWA specifies:

> Whenever the State revises or adopts a new standard, such revised
> or new standard shall be submitted to the Administrator.  Such
> revised or new water quality standard shall consist of the designated
> uses of the navigable waters involved and the water quality criteria
> for such waters based upon such uses.  Such standards shall be such
> as to protect the public health or welfare, enhance the quality of
> water and serve the purposes of this chapter.  Such standards shall
> be established taking into consideration their use and value for
> public water supplies, propagation of fish and wildlife, recreational
> purposes, and agricultural, industrial, and other purposes, and also
> taking into consideration their use and value for navigation.

  At this point, because the Court has not reached the merits, it is unclear as to

whether MDE created a new water-quality regulation and followed EPA procedures for doing so.

To the contrary, the Complaint alleges that MDE "provide[d] no authority" for the requirements

in the Certification.  Compl. ¶ 64.  Exelon alleges that MDE has interfered with EPA's jurisdiction, in this and other ways, which support jurisdiction in this district.

In 2010, following public notice and comment and pursuant to its authority under CWA Section 303(d)(2), EPA established the Chesapeake Bay Total Maximum Daily Load (Bay TMDL) for the entire Bay watershed.  Compl. ¶¶ 107-08.  To calculate the Bay TMDL, EPA "used then-available data and complex computer models that described hydrologic and water-quality processes, estimated the load of each pollutant to each water body, and predicted how the load would change as various remediation methods are implemented."  *Id*. ¶ 109.  The Bay TMDL established that a significant reduction in nitrogen and phosphorus levels would be required to meet the Bay's water-quality goals by 2025; EPA allocated the pollution reduction requirements among each of the 92 segments of the Bay watershed.  *Id*. ¶ 110.  Each segment is located in one of the seven Bay jurisdictions (six states and the District of Columbia), and thus the obligation to prevent pollution is allocated among all seven.

### 2.   *The Conowingo Project and the Bay TMDL*

The 2010 Bay TMDL assumed that the Conowingo Dam would retain its net pollutant-trapping capacity through 2025.  If it did not, EPA provided a contingency plan:  "'If future monitoring shows the trapping capacity of the dam is reduced, then EPA would consider adjusting the Pennsylvania, Maryland, and New York 2-year milestone loads.'"  *Id*. ¶ 116.

Since the 2010 Bay TMDL was adopted, EPA has become concerned that the Dam is reaching or has reached its "dynamic equilibrium," meaning that the amount of pollutants coming downriver from New York, Pennsylvania and Maryland *to* the Dam may eventually be roughly equal to the amount of pollutants flowing downriver *from* the Dam toward the Bay.  *Id*. ¶ 117.  In other words, the trapping capacity of the Conowingo Dam is significantly reduced

because the reservoir is no longer as deep.  While preparing for the 2017 Bay TMDL Midpoint Assessment, EPA learned that the 2010 projections had been "overly optimistic."  *Id*. ¶ 118.

Potential allocations of pollutant reductions have now been recalculated among the states whose waters empty into the Bay.  Included among the options for allocating the burden of reducing pollutants are: "(1) concentrating the burden of reallocation (for both nitrogen and phosphorus) solely in the Susquehanna River watershed and (2) spreading that burden across the entire Chesapeake Bay watershed."  *Id*. ¶ 119.  The first option would require reducing the nutrient loads entering the Susquehanna River by approximately 6,000,000 pounds of nitrogen and 260,000 pounds of phosphorus per year (the amounts imposed by the Certification on the Conowingo Project alone).  *Id*. ¶ 120.  Under this approach, Maryland polluters would be required to reduce their loads by about 120,000 pounds of nitrogen and 5,000 pounds of phosphorus in total per year because only 15 miles of the Susquehanna's 400-plus miles, and a fraction of the sources of pollution, are located in Maryland.  *Id*.  However, the second option—division across the entire Chesapeake Bay watershed—would require a much larger reduction in nutrient loads by Maryland sources because Maryland represents a large fraction of the total watershed of the Bay.  *Id*. ¶ 121.

In whatever direction EPA might decide this multistate issue under federal law, the Certification imposes on Exelon the full responsibility for removing nitrogen and phosphorus from the Susquehanna, in the full amounts that EPA may allocate to the three states that border the Susquehanna or to all seven jurisdictions responsible for implementing the Bay Program.

Exelon filed its Complaint on May 25, 2018 and Maryland filed a motion to dismiss.  After briefing, the Court held oral argument on the issue of venue.

## II.    LEGAL STANDARD

"[C]ertain nonmerits, nonjurisdictional issues may be addressed preliminarily, because '[j]urisdiction is vital only if the court proposes to issue a judgment on the merits.'" *Taylor v. Shinseki*, 13 F. Supp. 3d 81, 85 (D.D.C. 2014) (quoting *Pub. Citizen v. U.S. Dist. Court for Dist. of Columbia*, 486 F.3d 1342, 1348 (D.C. Cir. 2007)).  In this matter, Defendants reasonably ask that their challenge to venue be addressed first.  *See Shay v. Sight & Sound Sys., Inc.*, 668 F. Supp. 2d 80, 82 (D.D.C. 2009) ("Because there is no automatic priority for sequencing jurisdictional issues . . . a court may decide questions of venue before addressing issues of personal or subject matter jurisdiction.").

As relevant and addressed by the parties here, the federal venue statute provides that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2).  Under Federal Rule of Civil Procedure 12(b)(3), a defendant may move to dismiss for improper venue. Fed. R. Civ. P. 12(b)(3).  To prevail, "the defendant must present facts that will defeat the plaintiff's assertion of venue." *Slaby v. Holder*, 901 F. Supp. 2d 129, 132 (D.D.C. 2012) (citation omitted); *see also* Fed. R. Civ. P. 12(b)(3).  However, "the burden remains on the plaintiff to establish that venue is proper since it is 'the plaintiff's obligation to institute the action in a permissible forum.'" *Ananiev v. Wells Fargo Bank, N.A.*, 968 F. Supp. 2d 123, 129 (D.D.C. 2013) (quoting *Williams v. GEICO Corp.*, 792 F. Supp. 2d 58, 62 (D.D.C. 2011)).

While the Court accepts the factual allegations in the Complaint regarding venue as true, it "need not accept the plaintiff's legal conclusions as true, and may consider material outside the pleadings, including undisputed facts evidenced in the record, to determine whether it has jurisdiction in the case." *Ebron v. Dep't of Army*, 766 F. Supp. 2d 54, 57 (D.D.C. 2011).  In

analyzing whether venue is proper, federal courts engage in "a commonsense appraisal" of

"events having operative significance in the case." *Lamont v. Haig*, 590 F.2d 1124, 1134 (D.C.

Cir. 1978); *see also Maysaroh v. Am. Arab Commc'ns & Translation Ctr., LLC.*, 51 F. Supp. 3d

88, 93 (D.D.C. 2014).[2]

### III.    ANALYSIS

**A.  Is This a Federal Case?**

Exelon filed suit in the District of Columbia, alleging that:

> [v]enue is proper under 28 U.S.C. 1391(b)(2) because a state water-quality certification was formally requested on April 29, 2013 by FERC, located in the District of Columbia; the Certification was formally submitted on May 8, 2018, to FERC's Secretary, whose office is located in the District of Columbia; and the Certification contains requirements that, absent judicial intervention, will become conditions on a federal license that FERC will issue in the District of Columbia.

Compl. ¶ 13.  Thus, it asserts that "a substantial part of the events having 'operative significance'

to Exelon's claims occurred in this District," which makes venue here appropriate under

§ 1391(b)(2).  Opp'n at 30.  Count One alleges that Maryland has violated Sections 117 and 303

of the CWA, 33 U.S.C. §§ 1267, 1313, by interfering with EPA's Chesapeake Bay TMDL

without the authority to do so and without following formal public notice and comment as

necessary to amend the TMDL; Count Two alleges that the Certification violates Section 401 of

the CWA for multiple reasons and exceeds the scope of Maryland's authority under federal law;

Count Three alleges that Maryland violated the Supremacy Clause of the Constitution because its

---

[2] Maryland does not seek to transfer the Complaint under 28 U.S.C. § 1404(a) (giving discretion to transfer to another venue "[f]or the convenience of parties and witnesses, in the interest of justice").  Given the distance between Annapolis and the federal district courts in Baltimore and D.C., the lobbying in D.C. that Maryland agencies pursue, and the caseloads of the respective courts, such a motion would be dubious.

actions conflict with federal law and EPA's "exclusive authority to allocate" nitrogen and

phosphorus among the states and river basins in the Bay watershed; Count Four alleges a

regulatory taking by Maryland in violation of the Fifth and Fourteenth Amendments to the

Constitution; Count Five alleges that Maryland violated the Fourteenth Amendment's guarantee

of substantive due process; and Count Six alleges discrimination against federally-licensed dams

in violation of the Supremacy Clause.

      Maryland argues that state, not federal, law governs the water-quality certification

process.  *See* Defs.' Mem. at 12 (citing *Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991)

(commenting that a state certification "*presumably turns on questions of substantive state*

*environmental law . . .* [so that] a number of courts have held that disputes over such matters, *at*

*least so long as they precede the issuance of any federal license or permit*, are properly left to the

states themselves" (first emphasis added)); s*ee also* 33 U.S.C. § 1251(b) ("It is the policy of the

Congress to recognize, preserve, and protect the primary responsibilities and rights of States to

prevent, reduce, and eliminate pollution, to plan for the development and use . . . of land and

water resources, and to consult with the [EPA] Administrator in the exercise of his authority

under this chapter.").

      Maryland emphasizes that the Clean Water Act requires states to certify that "no

state water-quality standards will be violated by the proposed project" and that through this

mechanism states retain the power to block local water projects for environmental reasons.  33

U.S.C. § 1341(a)(1).  "[F]ederal courts have uniformly held that FERC has no power to alter or

review § 401 conditions, and that the proper forum for review of those conditions is state court."

*PUD No.1 of Jefferson Co. v. Wash. Dep't of Ecology*, 511 U.S. 700, 734 (1994) (Thomas, J.,

dissenting); *see also S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 384 n.8 (2006)

("FERC . . . may not review it."). The D.C. Circuit has recognized this principle fairly recently in *Alcoa Power Generating, Inc. v. FERC*, 643 F.3d 963, 971 (D.C. Cir. 2011) ("[A] State's decision on a request for Section 401 certification is generally reviewable only in State court, because the breadth of State authority under Section 401 results in *most challenges to a certification decision implicating only questions of State law*." (emphasis added)); *cf. Hoopa*, 913 F.3d at 1104 ("According to FERC, it is now commonplace for states to use Section 401 to hold federal licensing hostage.").

Maryland over-reads the binding precedent of the D.C. Circuit. Exelon's Complaint does not "turn[] on questions of substantive state environmental law," *Keating*, 927 F.2d at 622, or "implicat[e] only questions of State law." *Alcoa Power*, 643 F.3d at 971. Although Exelon is also challenging the Certification in state administrative and legal processes, the immediate Complaint clearly raises only questions concerning the federal Constitution and laws, is not designed to invent federal jurisdiction, and is not frivolous. *See Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 10 (D.C. Cir. 2011) (holding that the constitutionality of a Section 401 certification may be challenged "in federal (or state) court" (citation omitted)); *Keating*, 927 F.2d at 622 (a dispute about the application of § 401(a)(3) was "no doubt . . . a matter of federal law"); *see also Del. Riverkeeper Network v. Sec'y Pa. Dep't of Envtl. Prot.*, 833 F.3d 360, 371 (3rd Cir. 2016) ("Although the Clean Water Act makes clear that states have the right to promulgate water quality standards as they see fit, subject to EPA oversight, the issuance of a [§ 401] Water Quality Certification is not purely a matter of state law . . . . [I]t cannot *exist* without federal law, and is an integral element in the regulatory scheme established by the Clean Water Act." (emphasis in original)); *U.S. Steel Corp. v. Train*, 556 F.2d 822, 837 (7th Cir. 1977) (holding that State "§ 401 regulations, like any other state regulation or statue, can be challenged

on federal constitutional grounds in a federal action against the appropriate state officials"),

*abandoned on other grounds by City of W. Chicago, Ill. v. U.S. Nuclear Regulatory Comm'n*,

701 F.2d 632 (7th Cir. 1983).

Without doubt, Exelon's Complaint presents federal claims under 28 U.S.C.

§ 1331, which grants jurisdiction to federal district courts over "all civil actions arising under the

Constitution, laws or treaties of the United States."  Jurisdiction exists under § 1331 if "the right

of the petitioners to recover under their complaint will be sustained if the Constitution and laws

of the United States are given one construction and will be defeated if they are given another,"

unless the claim is "immaterial and made solely for the purpose of obtaining jurisdiction or . . .

frivolous."  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 643 (2002) (internal

quotation marks omitted).

Maryland's motion to dismiss because Exelon did not file the Complaint in "the

Appropriate State Court" will be denied.  Defs.' Mem. at 12.

### B.  Is This Case Filed in the Right Federal Court?

A more difficult question is whether Exelon filed its Complaint in the right

federal court or whether it should be transferred to the District of Maryland.

When a suit is filed in an improper venue, the district court "shall dismiss, or if it

be in the interest of justice, transfer such case to any district or division in which it could have

been brought."  28 U.S.C. § 1406(a).  When a defendant files a motion to dismiss because of

improper venue, the court "accepts the plaintiff's well-pled factual allegations regarding venue

as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and

resolves any factual conflicts in the plaintiff's favor."  *Pendleton v. Mukasey,* 552 F. Supp. 2d

14, 17 (D.D.C. 2008) (citation omitted).

16

The venue provision in 28 U.S.C. § 1391(b)(2) allows a plaintiff to sue in any judicial district "in which a substantial part of the events or omissions giving rise to the claim occurred."  Both parties agree that to determine where venue is proper, a court "undertake[s] a 'commensense appraisal' of the 'events having operative significance in the case.'"  *Maysaroh*, 51 F. Supp. 3d at 93 (quoting *Lamont v. Haig*, 590 F.2d at 1134).  *Lamont* was decided before the venue statute was amended to its current form.  Nonetheless, because the "choice of a single district ['in which the claim arose'] is a much more difficult undertaking when sophisticated multistate activities of relative complexity are in issue," *id.* at 1134, the D.C. Circuit "endorsed . . . wholeheartedly" the interpretation of other courts as "conferring venue in a district where a substantial portion of the acts or omissions giving rise to the actions occurred, notwithstanding that venue might also lie in other districts." *Id.*  The statute was later amended to reflect this legal analysis.  Thus "the question is not which district is the 'best' venue, or which venue has the most significant connection to the claim.  The question is 'whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts.'" *Johns v. Newsmax Media, Inc.,* 887 F. Supp. 2d 90, 96 (D.D.C. 2012) (quoting *Setco Enters. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994)); *see also Douglas v. Chariots for Hire*, 918 F. Supp. 2d 24, 29-30 (D.D.C. 2013) (finding venue was proper in D.C. when more than one-third of limousine driver's trips occurred in the district); *Weinberger v. Tucker*, 391 F. Supp. 2d 241, 244 (D.D.C. 2005); *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 543 (S.D.N.Y. 2005) (finding venue can be proper even if a greater proportion of events took place in elsewhere).

The connections to the District of Columbia upon which Exelon rests its venue claim are that:  (1) FERC, a federal agency located in D.C., has authority over all hydropower

17

dams on navigable waterways in the United States under the Federal Power Act; (2) the Certification interferes with two major federal regulatory regimes—the FPA and the Chesapeake Bay TMDL—administered respectively by FERC and EPA, also located in D.C.; (3) the Certification is contrary to the settlement between Exelon and DOI, in D.C.; the Certification was filed with FERC in D.C.; (4) only FERC, *not* Maryland, can and will enforce the new terms of the Certification as part of the new license; and (5) the FERC license issued from D.C. will result directly in the harm Exelon seeks to avoid because FERC has no discretion as to including the conditions of the Certification in a new license.

Exelon asserts that "this Court is a proper venue for enjoining conditions from being incorporated into a federal license in the District of Columbia." Opp'n at 29 (capitalization replaced). Of "operative significance," it notes that FERC requested the Certification from its office in D.C.; Maryland submitted the Certification to FERC in D.C.; Maryland filed the Certification on FERC's docket in D.C.; the Certification would impose on Exelon various requirements, such as fish-passage conditions that are contrary to the preexisting agreement between Exelon and the DOI Fish and Wildlife Service in D.C.; and, because Maryland claims that the Certification is immediately effective, FERC, acting in D.C., could incorporate it as mandatory terms in a new license for the Conowingo Project at any time. Exelon argues that it faces "the imminent threat" that FERC will incorporate the terms of the Certification into its new operating license, which can only happen in the District of Columbia, and that the order Exelon seeks from this Court will require actions in the District of Columbia, *i.e.*, an order that Maryland withdraw the Certification and so notify FERC. Exelon concludes, "regardless of where else venue might be proper, venue is proper in this district." Opp'n at 31.

Maryland responds at length, but its position can be summarized neatly:  it argues that "the only connections to the District [of Columbia] are procedural and *relate to the FERC license proceeding*, while the process *relating to the Certification* occurred in Maryland."  Defs.' Mem. at 33 (emphasis in original).

In arguing that Maryland is the only proper venue for this case, Maryland relies on *Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979).  *Leroy* involved an Idaho law that imposed restrictions on certain purchasers of stock in Idaho corporations.  Great Western, a publicly owned corporation headquartered in Dallas, Texas, filed suit in Texas against Idaho state officials responsible for enforcing the Idaho law.  *Id* at 175-77.  Defendants moved to dismiss for, *inter alia*, lack of venue in Texas.  The Supreme Court found that "the claim involved has only one obvious locus" because "it is action that was taken in Idaho[,] . . . the enactment of the statute by the legislature[,] . . . that provides the basis for [plaintiff's] federal claim." *Id*. at 185-86.  As Maryland notes, *Leroy* "rejected the notion that the claim could plausibly be said to have arisen elsewhere because it had an 'impact' on the issuance of federal securities in another state."  Reply at 3.

Maryland's reliance on *Leroy* is misplaced.  First, of course, Maryland does not cite a Maryland statute that addresses the conditions it put into the Certification.  Second, *Leroy* was decided under a previous version of the venue statute, now codified as amended at 28 U.S.C. § 1391.  *Leroy* interpreted the contemporaneous version of § 1391, which provided for venue in the district "in which the claim arose," to mean that "a plaintiff may choose between those two . . . districts that with approximately equal plausibility—in terms of availability of witnesses, the accessibility of other evidence, and the convenience of the defendant (but *not* of the plaintiff)— may be assigned as the locus of the claim." *Leroy*, 443 U.S. at 185.  As amended, the venue

statute now allows a civil action to be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b)(2).  This revision sought to "avoid[] the problem created by the frequent cases in which substantial parts of the underlying events have occurred in several districts."  H.R. Rep. No. 101-734 at 23.  In so amending, the Congress stated that "[t]he great advantage of referring to the place where things happened . . . is that it avoids the litigation-breeding phrase 'in which the claim arose'."  *Id*. Obviously, the amendment has not succeeded in avoiding all litigation on the issue, but the plain text of the statute as well as the statutory history clearly evidence Congress' recognition that a "substantial part of the events giving rise to claim [can] occur[]" in multiple districts and a plaintiff is not obligated to choose the *best* venue.[3]  Indeed, the Commentary on the 1988 and 1990 Revisions of Section 1391 notes that *Leroy* was "made largely academic" by the 1990 amendment to § 1391.

Under the current version of § 1391, this Court must only decide whether a "substantial part of the events giving rise to the claim occurred" in the District of Columbia for venue to be proper here.  "Nothing in section 1391(b)(2) mandates that a plaintiff bring suit in the district where the most substantial portion of the relevant events occurred, nor does it require a plaintiff to establish that every event that supports an element of a claim occurred in the district

---

[3] *See* David D. Siegel, Commentary on 1988 and 1990 Revision, following 28 U.S.C.A. § 1391 (1990) ("The fact that substantial activities took place in district B does not disqualify district A as proper venue as long as 'substantial' activities took place in A, too.  Indeed, district A should not be disqualified even if it is shown that the activities in B were more substantial, or even the most substantial.  Any other approach would restore the pinpointing problem that created the difficulties under the now discarded 'claim arose' standard.  If the selected district's contacts are 'substantial', it should make no difference that another's are more so, or the most so."); *see also Setco Enters.*, 19 F.3d at 1281 ("Under the amended statute, we no longer ask which district among two or more potential forums is the 'best' venue, as *Brice* did.  Rather, we ask whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts." (internal cites omitted)).

where venue is sought." *Douglas*, 918 F. Supp. 2d at 28-29. "[E]ven if a substantial part of the events in this case took place in Maryland, that does not preclude plaintiff from filing suit in the District of Columbia if a substantial part of the events took place here, as well." *Modaressi v. Vedadi*, 441 F. Supp. 2d 51, 57 (D.D.C. 2006).

The crux of the issue is that none of the conditions in the Certification will come to bear until FERC incorporates the Certification's terms into the new license for the Conowingo Project. FERC has no discretion on that matter so inclusion of the Certification's terms as a condition of the license is not a matter of speculation. Exelon argues that the event that triggers actual injury to it arguably interferes with FERC, EPA and DOI authorities and is a "substantial part" of the events giving rise to Exelon's claims can *only* happen in the District of Columbia and provides venue in this Court. It contends that this district has "a substantial connection to the claim, whether or not other forums ha[ve] greater contacts." *Setco Enters.*, 19 F.3d at 1281.

Indeed, the Certification is a "final" decision by MDE and is the legally operative document that will become binding only because of further action by FERC in D.C. Maryland tries to blunt this fact by arguing that the requirements of the Certification "*may* at some point be incorporated into a federal license issued by a federal agency headquartered in the District of Columbia" but its argument is based on a false premise. Defs.' Mem. at 34 (emphasis added and internal citations omitted). To the contrary, there is no doubt that the conditions of the Certification *will* be incorporated into the new license for the Conowingo Project unless Exelon's appeal under state law or this lawsuit under federal law prevent that action.

## IV.   CONCLUSION

In sum, FERC in D.C. is considering a new operating license for the Conowingo Project; FERC in D.C. asked Maryland to submit a water quality certification; Maryland submitted its Certification to FERC in D.C.; the obligations imposed by the Certification

allegedly interfere with multistate federal programs enforced by FERC, EPA and DOI in D.C.; the Certification will only obtain legal force when it is included in a new license granted by FERC in D.C.;  and once it becomes part of Conowingo's license, it will be enforced by FERC in D.C., not Maryland.  Indeed, if the Certification were not submitted to FERC, it would be an empty piece of paper.  These events have operative significance to Exelon's claims, *see* *Maysaroh*, 51 F. Supp. 3d at 93, and Maryland has not presented facts that defeat them, *see* *Slaby*, 901 F. Supp. 2d at 132; *see also* Fed. R. Civ. P. 12(b)(3).  They establish that a substantial part of the events giving rise to this suit occurred in the District of Columbia and venue is proper here.

 The Court will deny in part the State of Maryland's Motion to Dismiss, Dkt. 11. The Court will contact the parties to schedule a hearing on the remaining arguments in the Motion to Dismiss.

Date: March 29, 2019

                _____

                ROSEMARY M. COLLYER
                United States District Judge